WILLIAM T. McNees and Wife v. WILLIAM THOMPSON.

**Judgments—Pro Confesso—Imbecility as Defense.**

    William Thompson, in early life, was a man of ordinary business habits and was regarded in the vicinity where he lived as a prosperous and thrifty man. His affection for his wife and children was as strong and devoted as the relation of husband and parent required it should be, and in the discharge of his parental obligations he was in every way equal to the duty imposed on him. After the death of his wife and perhaps before and as early as the year 1863, it was discovered by his family physician that his mind was weakening from disease of the brain, resulting in almost entire loss of memory. After this time the affections he had had for his offspring seemed to have been no longer felt and his parental obligations to his children were no more observed. His grandchildren, who were raised in his own home were neglected and forgotten and he declared time and again without any excuse whatever, that his children should not own or enjoy any part of his estate. He then became estranged to his children and the only association he had was with the appellant. While in this condition he executed a note for a large sum, nearly half the amount of his entire estate, upon which suit was instituted, whereupon he walked into the court house and confessed judgment.

    **Held:** That at the date of the confession of the judgment by William Thompson he was not in a condition of mind to understand and comprehend what he was doing, and that hidden influences operated for the purpose of intensifying his hatred to his own offspring resulted in the execution of the note.

APPEAL FROM HARRISON CIRCUIT COURT.

February 2, 1872.

OPINION BY JUDGE PRYOR:

On the 20th day of December, in the year 1864, William Thompson executed to Sarah L. Thompson his note for eight thousand six hundred dollars, due and payable one day thereafter.

At the May term of the Harrison circuit court, in the year 1865, Sarah L. Thompson filed her petition on this note against William Thompson, and on the same day he came into open court and confessed judgment thereon. The judgment was then entered for the amount of the note and interest. In October, 1868, a petition in equity was filed in the same court by A. L. Thompson as relator for the committee alleging that Wil-

liam Thompson, by reason of his imbecility of mind and his advanced age, was incapable of managing his estate, and had been wasting his property, etc. Upon the hearing of this petition William Thompson was adjudged to be incompetent by reason of his want of intellect to manage his estate, and Hugh M. Keller appointed his committee to take charge of and control the same. William having intermarried with W. T. McNees instituted proceedings for the purpose of enforcing the judgment against William Thompson, rendered in the year 1865 against his estate in the hands of Hugh M. Keller, his committee. Keller pleaded to these proceedings against him as committee, "that William Thompson at the time he executed the note to Mrs. McNees (then Mrs. Thompson) was so imbecile in mind as to render him incapable of contracting or managing his own business affairs; that he was also in this same condition of mind at the rendition of the judgment upon the note." He further alleges that the note and judgment was obtained by the fraud and undue influence of Mrs. McNees. Whilst this controversy was pending, the committee Keller filed his petition in equity to subject to the payment of the purchase money a house and lot in Cynthiana, sold by William Thompson to Mrs. McNees. McNees and wife filed an answer and cross-petition in this case, in which they plead as a set-off this judgment obtained in 1865, or a sufficiency thereof to satisfy the debt due Keller as committee, and asks that the balance of the judgment be satisfied out of the estate of Thompson, then in Keller's possession and control. Keller, in response to this cross-petition, again alleges the imbecility of mind on the part of Thompson at the time he executed the note, and confessed the judgment, also the fraud and undue influence on the part of Mrs. McNees in both the note and judgment, and asks that the note be canceled and the judgment vacated, etc. Upon the hearing of the cause the note and judgment were both annulled by the court below, and from that judgment McNees and wife have appealed to this court.

The testimony shows that William Thompson in early life was a man of ordinary business habits, and from the circumstances surrounding him was regarded in the vicinity where he lived as one of the most prosperous and thrifty men in it.

His affection for his wife and children was as strong and devoted as the relation of husband and parent require that it should be, and in the discharge of his parental obligations he was in every way equal to the duty imposed upon him. After the death of his wife, and perhaps before, and as early as the year 1863, it was discovered by his family physician, who had known him long as a physician and friend, that his mind was being weakened by a disease of the brain, resulting in almost the entire loss of memory and the failure upon his part to recognize his most intimate friends, and even his own children.

His daughter, who had grown from infancy to womanhood under his own roof, as far back as the year 1863, had to convince him by argument that she was really his daughter. The affection he had for his own offspring from the period alluded to seems to have been no longer felt, and his parental obligations to his children were no more observed than if they were never.

The children of his daughter, Mrs. January, after her death, who had been partly raised in his own home, were neglected and forgotten and declarations made by him time and again as if it was his fixed purpose never to permit any of his children to enjoy or own any part of his estate. Nothing appears in this record upon which to base a conclusion that he had even the most remote cause for disinheriting his own children, and certainly nothing to drive from his bosom that parental feeling characterizing all his actions and conduct in the days of his mental vigor and manhood.

From the sober, steady business man he became the jest of the boys in the street, and seems to have been trifled with in his misfortune as one destitute of both feeling and intellect.

This condition of mind is proven by several witnesses to have existed from the year 1863 up to 1868, until by the judgment of the Harrison circuit court his estate was taken from him and placed in the hands of a committee.

The appellant introduced proof showing that between the execution of the note in 1864 and the year 1868, when this committee was appointed, that William Thompson made several advantageous sales of real estate, engaged in business pursuits and conducted a law suit with judgment and discretion, and that

in their opinion he was of sound mind and fully competent to contract.

This testimony, however, is confined to the statements of only two witnesses who profess to have been on intimate personal relations with him. That these sales were made, there can be no doubt, and that they evidenced in the absence of any other proof the existence of a mind competent to contract is equally certain. It is a little remarkable that of all the neighbors of William Thompson living as he did for nearly half a century in the midst of a thrifty and intelligent people, that but two witnesses who had been upon intimate terms with him testify as to his mental capacity, and one of those the father of the appellant.

The consideration for the execution of this note is based upon the following facts: McCauly Thompson, a son of William Thompson, was the first husband of Mrs. McNees and had by him one child. Robert Jones, shortly after the marriage of McCauly Thompson with his daughter, conveyed to his son-in-law a house and lot in Cincinnati. Thompson, the son-in-law, died, and a child by their marriage died shortly afterwards. By the law of Ohio the estate passed by descent from the child (dying under age) to the brothers and sisters of McCauly Thompson, and the appellants now say that William Thompson, learning that his children were about to assert claim to this Cincinnati property, disclosed his intention if they did so to fully indemnify Mrs. Nees (then Thompson), and in order to do so executed this note for eighty-six hundred dollars.

His children asserted claim to that property, and, although there was no legal or moral obligation upon William Thompson to indemnify his daughter-in-law, still if upon this consideration, and when capable of understanding what he was doing, and without any undue or improper influence exercised over him by others, he executed the note in controversy his estate must pay it.

Robert Jones and his daughter-in-law lived near and adjoining William Thompson. After he became isolated from his personal friends and estranged from his children the only associations he had were with the appellant, Mrs. McNees, and her father.

Robert Jones seems to have been his confidential advisor. His safe was the depository for his (Thompson') money and papers, and Jones, even in making to Thompson a payment on property purchased from him, counted out the money in the presence of the clerk, Thompson entirely oblivious as to what was going on; and after the money was counted, instead of giving it to Thompson, Jones took it from the counter or clerk and Thompson followed along after him, the former saying that he was going to place it in bank.

All such confidential relations existed between Thompson and Jones, and so far as this record shows, Thompson reposed confidence in no one else. It is proven that the note in controversy was written by W. W. Trimble, and that another writing was entered into at the same time. What this last writing contained does not appear. Who called upon the draftsman to prepare the writings is not shown in this record.

When these writings were signed by William Thompson, who was present at the time, and what transpired between the parties is all unexplained. How Robert Jones came into the possession of the note is not known. All the circumstances usually attending a transaction of such importance is left involved in mystery, and the first time the note is seen in the presence of any one is when Robert Jones has it at his store and calls upon young Givens to attest it. The circumstances attending such a transaction between those whose minds enable them to transact the ordinary business affairs of life need no explanation, but where the facts exist that create a strong suspicion in the mind of the chancellor that the intellect of one who is sought to be made liable was impaired by disease or old age at the time of the creation of the liability, it devolves upon the party seeking to enforce such a claim to remove this suspicion when the proof, if it exists, must be within his reach. Givens enters the store house of Jones, attests this note at Jones' instance, and not one word is said to William Thompson, and no word spoken by him. This note is not again seen until nearly a year after the attestation by Givens, when Jones hands it to a lawyer with directions to prepare a suit upon it (court then being in session) and that William Thompson would appear in court and confess judgment. Thompson did appear in court, and in his own person

confessed judgment for this note equal in amount to nearly the value of one-half his estate. Thompson is a silent actor in all the mystery connected with the execution of this note until he enters the court room, and by this confession of judgment subjects his estate to sale for this large sum under execution. No consultation in regard to the assumption of this responsibility is had by Thompson with any one, and if influenced to execute the note by his ideas of justice, and with a judgment that alone controlled his action, it is very strange that upon his return to reason it did not occur to him that his own children, and if not them, his grandchildren, had some claim upon his bounty or enable him to recall at least the oft repeated declaration made by him that he intended to disinherit them all. This unnatural and insane purpose entertained without a cause seems never to have been abandoned by him so far as this record shows. This insane aversion to his children originated prior to the claim set up by them to the Cincinnati property. It was the result of a deranged mind produced by disease of the brain and hastened in its progress by reason of his advanced age. The evidence in this case upon the question of capacity alone conduces strongly to show that at the date of the note in controversy and at the date of the confession of the judgment by William Thompson, he was not in a condition of mind to understand and comprehend what he was doing, and we are further satisfied that with an intellect weakening day by day, hidden influences, the existence of which is now and then made to appear by the proof in the cause, operated upon William Thompson to an extent that controlled and moulded his will for purposes that aided to intensify his hatred to his own offspring and resulting in the execution of this note for $8,600 in the year 1864 and the confession of judgment upon it in 1865.

The judgment of the court below is affirmed.

*Trimble*, for appellant.

*Ward, Cleary*, for appellee.